Filed 6/5/26  P. v. VanCamp CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JACKIE GLENN VANCAMP,<br><br>Defendant and Appellant. | F089432<br><br>(Super. Ct. No. F23906725)<br><br>**OPINION** |

THE COURT\*

APPEAL from a judgment of the Superior Court of Fresno County.  Ryan I. Wells, Judge.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Detjen, Acting P. J., Snauffer, J. and DeSantos, J.

Defendant Jackie Glenn VanCamp pled no contest to four counts of maliciously attempting to dissuade a witness. Pursuant to the plea agreement, he was sentenced to 16 years in prison. The trial court also imposed fines and fees.

Defendant's appointed counsel filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436, identifying no error and asking us to determine whether there are any arguable issues on appeal. Defendant was afforded an opportunity to submit a letter brief, and he did so.

Subsequently, we ordered the parties to submit supplemental briefing regarding the following questions:

> "1. Do any of defendant's convictions for maliciously attempting to dissuade a witness involve domestic violence as required by [Penal Code] section 136.2, subdivision (i)? [¶] 2. Did the trial court err by checking box 10 on the criminal protective order, which relates to pretrial orders issued pursuant to [Penal Code] section 136.2, subdivision (a)(1)? [¶] 3. Because defendant did not have the benefit of *Kopp's*[1] reasoning and did not invoke the excessive fines clauses in the trial court, should we remand the matter to give him the opportunity to challenge his punitive fines pursuant to the excessive fines clauses?"

In his supplemental brief, defendant's appointed counsel contends that none of defendant's convictions involve domestic violence, the trial court erred by checking box 10, and the case should be remanded to give defendant the opportunity to challenge the fines and fees. The People did not submit a supplemental brief.

After considering appointed counsel's supplemental brief and the contentions raised by defendant, and conducting our own independent review of the record, we conclude the trial court erred in issuing the criminal protective under section 136.2, subdivision (i).[2] Additionally, in light of the reasoning and holding in *Kopp*, we will

---

[1] *People v. Kopp* (2025) 19 Cal.5th 1, 23 (*Kopp*).

[2] As the trial court erred in issuing the criminal protective order and we are directing the trial court to strike it, we do not address whether the court erred by checking box 10 on the protective order.

direct the court to give defendant an opportunity to challenge the restitution fine, the court operations assessment, and the court facilities assessment. However, there are no other arguable issues that would result in a disposition more favorable to defendant, and in all other respects, the judgment is affirmed.

## PROCEDURAL SUMMARY

On January 29, 2025, the Fresno County District Attorney filed a third amended information charging defendant with willfully inflicting corporal injury to a person with whom he has or had a dating relationship, resulting in a traumatic condition (Pen. Code,[3] § 273.5, subd. (a); count 1); false imprisonment by violence (§ 236; counts 2, 23); making a criminal threat (§ 422; count 3); vandalism resulting in damage of $400 or more (§ 594, subd. (b)(1); count 4); assault with a deadly weapon (§ 245, subd. (a)(1); count 5); maliciously attempting to dissuade a witness (§ 136.1, subd. (a)(2); counts 6–15); and contempt of court in a pending case (§ 166, subd. (c)(1); counts 16–22). The third amended information also alleged multiple aggravating factors, that defendant had three prior strike convictions within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), and that defendant had three prior serious felony convictions (§ 667, subd. (a)(1)).

On January 29, 2025, defendant entered into a plea agreement with a stipulated sentence. He pled no contest to counts 6 through 9 and admitted having suffered one prior strike conviction in exchange for dismissal of the remaining counts and allegations.[4] He was sentenced on March 3, 2025. Pursuant to the agreement, the trial court imposed an aggregate term of 16 years, consisting of four years on each count (the middle term of

---

[3]    Undesignated statutory references are to the Penal Code unless otherwise noted.

[4]    Defendant entered into a nearly identical plea agreement on November 8, 2024. However, the strike prior he admitted was not in fact a strike. Accordingly, the court granted his motion to withdraw his plea, and he entered into a new plea agreement in which he admitted to a different strike prior.

two years, doubled due to the prior strike conviction). The court also imposed fines and fees, awarded defendant a total of 1088 days of custody credits, and issued a criminal protective order pursuant to section 136.2, subdivision (i).

On March 4, 2025, defendant timely filed a notice of appeal. However, he did not request, and was not granted, a certificate of probable cause.

## FACTUAL SUMMARY[5]

"[D]efendant … and the Confidential Victim (CV, age 32), had been in a dating relationship for close to one month. [Defendant] had been living at the confidential location for the prior three weeks.

"On September 7, 2023, at approximately 4:58 p.m. officers were dispatched to a confidential location to assist a parole agent with an in-custody parolee, [defendant].

"Upon arrival, officers spoke to Parole Agent Cutshall, who reported she went to the confidential location to conduct a random parole check on [defendant]. When she arrived, she observed an older child crying at the window. She believed the child had an issue with their parent, but when she had [defendant] go to the restroom to provide a urine sample, [CV] showed Agent Cutshall her neck, which was red.

"[Defendant] returned from the restroom, and his urine test was positive for drugs. Agent Cutshall asked if everything was okay between [CV] and [defendant]. [Defendant] replied he and [CV] had an argument. [CV] did not say anything. [Defendant] became upset and stated, 'Hey really you going to do this.' Based on the circumstances, Agent Cutshall detained [defendant] in handcuffs. [Defendant] then stated, 'I'm going to go to jail over this.' Agent Cutshall called law enforcement to investigate.

"When officers arrived, [CV] was very emotional and did not want to talk about what occurred. Officers observed redness and scratches on her neck. [CV] stated she was scared of something happening to her and her child, but did not elaborate. Officers asked her if the scratches on her neck

---

**5** This factual summary is from the probation report's summary of facts, which was based on a crime report and court documents. The probation report was filed before the third amended information was filed, which added count 23.

4.

were caused by [defendant].  She replied they were from [defendant] the previous night.  There were not any physical incidents that day.

"[CV] stated she had known [defendant] for over 20 years.  [CV] denied using drugs or alcohol.  She did not know if [defendant] used any drugs or alcohol.  She reported [defendant] had been 'up and down' all day, and he suffered from mental health conditions.

"**Count [1]**:  On September 7, 2023, at approximately 12:30 a.m., [defendant] woke up and was 'tripping out.'  He accused [CV] of 'stuff.'  He 'head butted' [CV] on her head and chest two times and told her she was 'playing him.'  He grabbed her cell phone (Value $800.00) and broke it (**Count [4]**).  He told her, 'You think you going to fucken call anyone,' and 'You think you're going to run, try and run bitch, try and run' (**Count [3]**).  He grabbed her by her hair and pulled her off the bed and towards the closet, causing her to hit the right side of her head on the door frame and fall into the closet.  He told her to get into the closet and "shut the fuck up' (**Count [2]**).  [Defendant] did not allow her to leave.

"[CV] told [defendant] there was someone in the house.  [Defendant] replied no one was there, and, if someone went through her door, he would hurt them.  He grabbed a hatchet out of the closet and continued to threaten [CV].  He hit [CV] in the chest with the hatchet, which was still in its blade cover/case (**Count [5]**).  [CV] could not recall how many times he hit her with the hatchet.

"[Defendant] swung the hatchet around and paced back and forth in the room.  He continued to accuse [CV] of 'stuff.'  When [CV] told him he was wrong, he 'sucker punched' her on the right side of her face.  He threatened to turn the stove on and set her hair on fire because he wanted her to feel how he felt.  He forced her to follow him around while he was armed with the hatchet, refused to let her leave, and told her, 'I'll dismember you.'

"[Defendant] threw things at [CV's] face.  At one point, he grabbed her by her neck, grabbed her skin, and twisted it for approximately 30 seconds.  [CV] could not breathe.  She did not recall if she passed out.  At approximately 2:30 a.m., [defendant] fell to the floor and started crying.  He hugged her and told her he was sorry.  They both fell asleep in the bed.

"[CV's] two children were asleep inside of the confidential location during the disturbances.  [CV] had a light green/yellow bruise on her right cheek and redness on her chest.  Officers showed [CV] a photograph of [defendant], and she positively identified him as the person who assaulted

5.

her and took her phone and broke it.  She requested and received an Emergency Protective Order ….   She declined needing medical attention.

"[D]efendant denied touching [CV] and taking her phone.  He accused [CV] of hitting him two days prior.  He reported when he returned home, she was 'drunk' and 'snapped.'  He also caught her with drugs, and things kept going missing.  He did not report these allegations to police.  He told officers the bruises on [CV] were from sex, and the mark on her neck was a 'hickey.'  He also denied hitting [CV] with a hatchet.  He admitted he used methamphetamine three days prior.  [He] then accused [CV] of attacking him with the hatchet, causing a small cut on his pinky finger.  He stated that he was the victim, and he wanted to press charges against her.  He declined medical attention.

"Officers spoke to [CV] again, and she denied all the allegations made by [defendant].

"[D]efendant made statements about wanting to harm himself and was placed on a [Welfare and Institutions Code section] 5150 hold.  After he was medically cleared, he was transported and booked into the Fresno County Jail.

"On September 13, 2023, [defendant] appeared in court, and a full Criminal Protective Order … was issued protecting [CV] from [defendant].  The remaining counts are related to several jail calls made by [defendant] to [CV.]

"**Count [6]**:  On September 11, 2023, [defendant] called [CV] and told her not to come to court.  He also told her not to worry, and 'they can't do anything to you for not coming.'  He promised her she would 'never see that side of him again.'

"**Counts [7] and [8]**:  On September 12, 2023, [defendant] called [CV] and told her not to show up to court and he would be with her soon.

"During a second call made that day, [defendant] told [CV] what the court process was going to be like.  He directed her not to come to court and told her nothing will happen to her.  He further stated that if she did not show up to court 'they' would let him out for a 'little violation.'  He stated, 'I mean, it's little compared to a life sentence for what we went through.  I'm not saying it's unwarranted, what I did wasn't right, but I don't think I should spend the rest of my life in prison for an action.  I didn't hurt you.  I didn't kill nobody.'

"**Counts [9] and [16]**:  On September 13, 2023, [defendant] told [CV] if she comes to court, he will get a 'life sentence.'  He told her not to come to court and to 'dodge them' so 'they' cannot bring her to court.  He stated, 'They'll say anything and do anything to convict me and put me in prison, so don't believe them.'  He further stated, 'But if you don't show up at all, they can't do nothing.'  He told her if she did show up in court, he would never get out of prison.  He pled with her to not go to court, assured her nothing would happen to her, and 'they' would not take her children away.

"**Counts [10] and [17]**:  On September 13, 2023, on a separate call, [defendant] told [CV] to 'stick to the game plan.'  He told her not to answer the door and that she would not go to jail.

"**Counts [11] and [18]**:  On September 13, 2023, on a separate call, [defendant] reassured [CV] everything would be okay.  He directed her to not answer her door and, if she got a subpoena, not to go to court.  He also told [CV] 'they' would tell her she was in contempt of court, but 'they're actually not allowed to do that, it's against the law but they still do it.'

"**Counts [12] and [19]**:  On September 13, 2023, on a separate call, [defendant] told [CV] to not contact the [District Attorney] or Public Defender.  He stated, 'Just don't show up and they can't do nothing.  If you're not here, they cannot do anything.  I have a right to face my accusers.'

"**Counts [13] and [20]**:  On September 13, 2023, on a separate call, [defendant] stated, 'I won't get in trouble.  The only way I get into trouble is if you tell on me.'  [Defendant] told her if they drug her down there, to lie, and to say she was mad at [defendant] because he was going to cheat on her or to make something up.'

"**Counts [14] and [21]**:  On September 13, 2023, on a separate call, [defendant] told [CV] not to answer her phone or open the door for anybody.  He stated, 'They're going to try to scare you, they're going to try to arrest you.'  He told her 'they can't do that,' and informed her his trial date would be in 60 days.  He promised her everything would be okay, and, if she was forced to go to court, to lie.

"**Counts [15] and [22]**:  On September 14, 2023, [defendant] told the CV not to come to court.  He stated, 'So if I do a speedy trial, 60 days it's over, and the DA can't do nothin' about it.  They can't even refile.  So I'm just letting you know.  I'm not going to say it no more cause like even

though … I gotta be careful cause it's actually dissuading a witness, and I've had, I've had one of those.' "

## DISCUSSION

I. **The Trial Court Erred in Issuing the Criminal Protective Order Pursuant to Section 136.2, Subdivision (i)**

### A. *Applicable Law*

Section 136.2, subdivision (i) states: "[w]hen a criminal defendant has been convicted of a crime involving domestic violence, as defined in [s]ection 13700 or in [s]ection 6211 of the Family Code, a violation of subdivision (a), (b), or (c) of [s]ection 236.1 prohibiting human trafficking, [s]ection 261, 261.5, former [s]ection 262, subdivision (a) of [s]ection 266h, or subdivision (a) of [s]ection 266i, a violation of [s]ection 186.22, or a crime that requires the defendant to register pursuant to subdivision (c) of [s]ection 290, the court, at the time of sentencing, shall consider issuing an order restraining the defendant from any contact with a victim of the crime." (§ 136. 2, subd. (i).)

As relevant here, section 13700, subdivision (b), defines " '[d]omestic violence' " as " 'abuse' committed against an adult … with whom the suspect has had … a dating or engagement relationship." Section 13700, subdivision (a), defines " '[a]buse' " as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another."

Family Code section 6211 defines " '[d]omestic violence' " as "abuse perpetrated against [¶]…[¶] [a] person with whom the [defendant] is having or has had a dating or engagement relationship." (Fam. Code, § 6211, subd. (c).) Under this section, " 'abuse' means any of the following: [¶] (1) To intentionally or recklessly cause or attempt to cause bodily injury[;] [¶] (2) Sexual assault[;] [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another[; and] [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to [Family

8.

Code] [s]ection 6320." (Fam. Code, § 6203, subd. (a)(1)–(4).) Pursuant to Family Code section 6320, subdivision (a), a court "may issue an ex parte order enjoining a party from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, credibly impersonating as described in [s]ection 528.5 of the Penal Code, falsely personating as described in [s]ection 529 of the Penal Code, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in [s]ection 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party."

### B. Analysis

In this case, defendant was charged with crimes involving domestic violence. According to evidence introduced at the preliminary hearing, defendant was in a dating relationship with CV and he both threatened to harm her and physically assaulted her.

However, defendant only pled guilty to four counts of maliciously attempting to dissuade a witness (§ 136.1, subd. (a)(2)). Based on the limited record before us, the charges were based on calls between defendant and CV, during which defendant urged CV not to testify against him. None of the calls involved defendant threatening, intimidating, or physically injuring CV. Moreover, there is no evidence in the record that the calls were harassing, or that defendant disturbed CV's peace. Accordingly, the four counts for which defendant was convicted do not involve domestic violence as defined in section 13700 or in Family Code section 6211. Further, section 136.1, subdivision (a)(2) is not explicitly listed in section 136.2, subdivision (i)(1), nor does a violation of section 136.1, subdivision (a)(2) require a person to register pursuant to section 290, subdivision (c) upon conviction. Hence, the trial court was without authority at sentencing to issue the criminal protective order for CV's benefit under section 136.2, subdivision (i)(1). As the court did not have statutory authority to issue the criminal protective order, it must be stricken. (*People v. Garcia* (2022) 76 Cal.App.5th 887, 901.)

## II.    *People v. Kopp*

On March 3, 2025, the trial court held the sentencing hearing.  After hearing argument regarding the appropriate amount of the restitution fine pursuant to section 1202.4, subdivision (b), the court imposed a $2,400 restitution fine, as well as a $2,400 parole revocation fine pursuant to section 1202.45.  The court also imposed a $40 court operations assessment (§ 1465.8, subd. (a)(1)) and a $30 court facilities assessment (Gov. Code, § 70373, subd. (a)(1)) on each count.

On December 29, 2025, our Supreme Court decided *People v. Kopp*, *supra*, 19 Cal.5th 1.  As to punitive fines, including restitution fines, the court found that due process does not require a trial court to "hold an ability to pay hearing before imposing every punitive fine."  (*Kopp*, at pp. 13, 23, fn. omitted.)  However, the court also noted that "both the federal and state Constitutions prohibit excessive fines," and held that "the excessive fines analysis, which considers ability to pay, is the proper vehicle to challenge punitive fines."  (*Id* at p. 23.)  As to court operations assessments and court facilities assessments, which are ancillary costs, the court held that "equal protection principles require a court, upon request, to consider a defendant's inability to pay" before imposing either assessment.  (*Id.* at p. 30.)

Because neither defendant nor the trial court had the benefit of *Kopp's* reasoning and holding at the time of the sentencing hearing, we will direct the court to give defendant an opportunity to challenge the restitution fine and the assessments under *Kopp*.[6]  (See, e.g., *Kopp*, *supra*, 19 Cal.5th at p. 23 ["[The defendant] did not invoke the excessive fines clauses in the trial court.  We remand to give [the defendant] the opportunity to assert the legal analyses applicable to such a challenge and argue how the particular facts of this case inform such an inquiry."].)

---

[6]    The parole revocation fine is imposed "in the same amount as the restitution fine." (*Kopp*, *supra*, 19 Cal.5th at p. 14.)

**III.     Issues Raised by Defendant**

In his letter brief, defendant makes multiple claims of error, almost all of which challenge the validity of his convictions or the validity of the stipulated sentence.[7] However, defendant pled no contest to counts 6 through 9, and the plea agreement included a stipulated sentence. Moreover, he did not request, nor was he granted, a certificate of probable cause. Accordingly, these claims are not properly before us.

Generally, a defendant must obtain a certificate of probable cause to appeal from a judgment entered upon a no contest plea. (§ 1237.5; *People v. Shelton* (2006) 37 Cal.4th 759, 766.). However, our Supreme Court has "long recognized two exceptions…. First, a defendant may appeal from a ruling involving a search and seizure issue without obtaining a certificate, because an appeal from such a ruling explicitly is authorized by section 1538.5 'notwithstanding the fact that the judgment of conviction is predicated upon a plea of guilty.' [Citations.] Second, a defendant is 'not required to comply with the provisions of section 1237.5 where … he is not attempting to challenge the validity of his plea of guilty but is asserting only that errors occurred in the subsequent adversary hearings conducted by the trial court for the purpose of determining the degree of the crime and the penalty to be imposed.' " (*People v. Johnson* (2009) 47 Cal.4th 668, 677.)

Neither exception applies here. Defendant is not appealing a ruling involving a search or seizure issue. Moreover, because the plea agreement included a stipulated sentence, defendant's challenges to his sentence constitute a challenge to the validity of the plea. (*People v. Panizzon* (1996) 13 Cal.4th 68, 79 ["a challenge to a negotiated sentence imposed as part of a plea bargain is properly viewed as a challenge to the validity of the plea itself"].) Thus, defendant's claims regarding his convictions and

---

[7]     The only claim raised by defendant that does not challenge the validity of his convictions or the stipulated sentence relates to the restitution fine. As discussed above, we will direct the trial court to give defendant an opportunity to challenge the restitution fine under *Kopp*, *supra*, 19 Cal.5th 1.

sentence challenge the validity of the plea. And as defendant was not granted a certificate of probable cause, these claims are not properly before us.[8]

## DISPOSITION

The restitution fine, the parole revocation fine, the court operations assessment, and the court facilities assessment are vacated. The trial court is directed to strike the criminal protective order and to give defendant an opportunity to challenge the restitution fine and the assessments under *Kopp*, *supra*, 19 Cal.5th 1. In all other respects, the judgment is affirmed.

---

[8] We also note that some of defendant's claims are not supported by the record. For example, defendant asserts that he filed a motion pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 "to no avail." However, this motion is not in the record.